UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ORTHOFIX INC.,

          Plaintiff,                    No. 13-11421

v.                                District Judge Stephen J. Murphy, III
                                    Magistrate Judge R. Steven Whalen

ROBERT LEMANSKI,

          Defendant.

_____ /

## OPINION AND ORDER

Before the Court are Defendant Robert Lemanski's Motions to Exclude Opinion Testimony of Plaintiff's Damages Expert [Doc. #74 and #75], which have been referred for hearing and determination under 28 U.S.C. § 636(b)(1)(A).[1] For the reasons discussed below, the motions are GRANTED.

## I.   BACKGROUND

This is a wrongful competition case. Plaintiff Orthofix, Inc. ("Orthofix") produces and markets bone-growth stimulators. Defendant Robert Lemanski ("Lemanski") and Eric Hunter ("Hunter") were employed by Orthofix. Lemanski sold bone-growth stimulators to spinal surgeons in the Detroit area, and Hunter sold in the Toledo, Ohio area.  Orthofix

---

[1] The publically filed motion is found at Doc. #74, and the same motion, unredacted and filed under seal, is found at Doc. #75.

alleges that both Lemanski and Hunter resigned in November of 2012, to join a competitor, DJO Global LLC, and that they misappropriated and took customer account identities, sales histories, product preferences, and other trade secrets. Orthofix filed a separate lawsuit against Hunter in the Northern District of Ohio. *Orthofix, Inc. v. Eric W. Hunter*, N.D. Ohio No. 3:13-CV-828.

In its amended complaint [Doc. #9], Orthofix alleged five claims: (1) breach of a contractual non-solicitation provision (Count I); (2) breach of a contractual unfair competition provision (Count II); (3) breach of contractual promise not to disclose confidential information (Count III); (4) trade secret misappropriation (Count IV); and (5) tortious interference with business relations (Count V). On March 25, 2015, the Court dismissed Counts III, IV, and V [Doc. #87]. Orthofix seeks monetary damages on the remaining Counts I and II.

Orthofix's damages expert, Mike L. O'Brien ("O'Brien"), prepared a report that is appended to Lemanksi's sealed motion [Doc. #75] as Exhibit A. O'Brien, a Certified Public Accountant, based his conclusions on spreadsheets summarizing Orthofix's monthly sales averages.  This Court's dismissal of Counts III, IV, and V was premised on the preclusive effects of Judge Zouhary's findings in the Ohio case against Hunter. O'Brien also served as Orthofix's damages expert in the Ohio case. Stating that "no distinction is made between Mr. Hunter and Mr. Lemanski regarding the claimable damages by Orthofix against each Defendant," O'Brien initially calculated lost sales

-2-

damages at $3.8 million. However, he reduced his opinion to $1.6 million owing to "bad

data" in the spreadsheets. In an email to Judge Zouhary, offered as Defendant's Exhibit F,

counsel for Orthofix stated:

> "Sales reports prepared by the Orthofix finance department which were the
> basis for Orthofix's expert's damage calculations overstated sales in the
> relevant period by approximately double. This overstatement was the result
> of an IT error in generating the report from Orthofix's database, which
> caused duplicate sales to be reported. As a result of this bad data
> unrecognized by Orthofix, its counsel, or its expert, Orthofix's expert's
> report overstated Orthofix's damages."

Lemanski now seeks to exclude O'Brien's expert report under *Daubert v. Merrell*

*Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## II.   LEGAL PRINCIPLES

Fed.R.Ev. 702 provides as follows:

> "If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case."

Rule 702, as amended in 2000, codifies the Supreme Court's decisions in *Daubert*

*v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael,*

526 U.S. 137, 147-49 (1999).  *See* Rule 702 advisory committee's notes, 2000 amend.

("In *Daubert* the Court charged trial judges with the responsibility of acting as

gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that

this gatekeeper function applies to all expert testimony, not just testimony based in

science."). The admissibility of expert testimony under Rule 702 entails a flexible inquiry,

and is addressed to the trial judge's discretion. *Id.*; *Daubert,* 509 U.S. at 594.  In *In re*

*Scrap Metal Antitrust Litig.,* 527 F.3d 517, 528-29 (6th Cir.2008), the Sixth Circuit

described the Rule 702/*Daubert* process as follows:

> "Parsing the language of the Rule, it is evident that a proposed expert's
> opinion is admissible, at the discretion of the trial court, if the opinion
> satisfies three requirements. First, the witness must be qualified by
> 'knowledge, skill, experience, training, or education.' Fed.R.Evid. 702.
> Second, the testimony must be relevant, meaning that it 'will assist the trier
> of fact to understand the evidence or to determine a fact in issue.' *Id.* Third,
> the testimony must be reliable. *Id.* Rule 702 guides the trial court by
> providing general standards to assess reliability: whether the testimony is
> based upon 'sufficient facts or data,' whether the testimony is the 'product
> of reliable principles and methods,' and whether the expert 'has applied the
> principles and methods reliably to the facts of the case.' *Id.* In addition,
> *Daubert* provided a non-exclusive checklist for trial courts to consult in
> evaluating the reliability of expert testimony. These factors include:
> 'testing, peer review, publication, error rates, the existence and maintenance
> of standards controlling the technique's operation, and general acceptance in
> the relevant scientific community.' *United States v. Langan,* 263 F.3d 613,
> 621 (6th Cir.2001) (citing *Daubert,* 509 U.S. at 593-94, 113 S.Ct. 2786).
> The test of reliability is 'flexible,' and the *Daubert* factors do not constitute
> a 'definitive checklist or test,' but may be tailored to the facts of a particular
> case. *Kumho,* 526 U.S. at 150, 119 S.Ct. 1167 (citing *Daubert,* 509 U.S. at
> 593, 113 S.Ct. 2786). Indeed, we have recognized that the *Daubert* factors
> 'are not dispositive in every case' and should be applied only 'where they
> are reasonable measures of the reliability of expert testimony.' *Gross v.*
> *Comm'r,* 272 F.3d 333, 339 (6th Cir.2001).

## III.   DISCUSSION

Mike O'Brien is a Certified Public Accountant. Lemanski does not challenge his

professional qualifications as an expert, but rather attacks the relevance and reliability of

his conclusions. O'Brien's report fails the test of reliability, and for that reason, it must be excluded.

"[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142 (emphasis in original). A critical aspect of reliability is the sufficiency or integrity of the facts or data that support the expert's opinion. *See* Rule 702(b). In this case, O'Brien's reliance on Orthofix's monthly sales spreadsheets, without examination of or inquiry into any of the underlying documents, raises serious questions about the reliability of his opinion.

It is undisputed that O'Brien did not review any hard data concerning sales. His written report (Defendant's Exhibit A) specifies that "[t]he opinions expressed herein are based upon my review of the materials disclosed in Exhibit III [to the report]." Exhibit III, in turn, lists Orthofix's monthly sales numbers (the spreadsheets), but not any supporting documentation. Indeed, O'Brien testified at a deposition in a separate Orthofix case[2] in a Texas state court, that not only was he uninvolved with the extraction of the supporting data, but notwithstanding the error in the spreadsheets that overstated the alleged damages by a factor of two, he still declined to review the underlying documents:

> Q: And what did you understand that data to be in comparison to the data
> that had been given to you from the outset that resulted in your original

---

[2] *Orthofix, Inc. v. David Wagenseller, et al.*, Harris County, Texas District Court, No. 2013-18401. The transcript is appended to Lemanski's motion as Exhibit C.

report? What was the difference?

A: The difference was the extraction methodology utilized by Orthofix in extracting that information from its accounting records.

Q: *Did you assist in that from the outset?*

A: *Assist in what?*

Q: *Extracting that data.*

A: *No.*

Q: *It was presented to you by Counsel; is that correct?*

A: *Yes.*

Q: And what was it represented to be, if you recall?

A: It was represented to be sales to the 28 customers identified in my report.

Q: And why did they have to supplement or amend that data, do you know?

A: Yes.

Q: What is the reason?

A: The reason is there was an error in the program that was utilized in extracting that information.

Q: But do you know what that error consisted of in terms of, practically speaking, what that means?

A: In a general sense, yes.

Q: What does it mean, in a general sense?

A: In a general sense, it means that certain sales were duplicated in the extraction process; therefore, the original sales data was overstated. The error was detected and corrected, *and the revised sales data, hopefully,*

-6-

*eliminated the duplication of the sales which had been extracted.*

Q: *And there was no way that you were able to detect that duplication from the original sales data that was given to you; is that correct?*

*A: That is correct.*

*Q: Was there a way for you to validate that data at the time to determine whether or not it was valid data?*

*A: Yes.*

*Q: And express to me some of the ways in which a CPA or a man of your training and experience would validate the sales data that's been given to you in this instance.*

*A: By going in and reviewing underlying documents and data and verifying the information which had been extracted.*

*Q: And you did not do that in this instance, did you?*

*A: I did not do that.*

*Q: And it would not require a full review of all the data; you could do that by simply sampling the data. Is that a fair statement?*

*A: I guess my best answer is I don't know because I didn't do it.  But I would certainly think so, yes.* (Emphasis added).

From this testimony, we know that O'Brien did not prepare the spreadsheets that

formed that basis of opinion, but rather Orthofix's counsel provided them. We also know

that in reviewing those spreadsheets, O'Brien was incapable of detecting an error that

resulted in a significant overstatement of his initial damages calculations. He was no more

capable of determining whether there were errors in the revised spreadsheets, which he

"hoped" were accurate, and he declined to avail himself of the one method that would

-7-

verify the accuracy of the sales date–a review of the underlying documents. It is not surprising that the Texas State Judge granted the defendant's motion to strike O'Brien's report. *See* Defendant's Exhibit A.

Orthofix suggests that an examination of all of the sales data would have been unwieldy. However, this ignores the possibility of at least reviewing a sampling of the data. Moreover, the underlying sales documents were readily available. In my March 31, 2015 Order granting Lemanski's motion to compel sales data [Doc. #88], I noted that in a parallel Orthofix case in the Central District of Illinois, Judge Schanzle-Haskins, addressing the error in Orthofix's initial damages calculation, stated, "It is reasonable that the problems with the Plaintiff's damage calculation prompts the Defendant to seek underlying data in order to ensure the validity and accuracy of the Plaintiff's damage calculations." Doc. #88, pp. 4-5. Ordering Orthofix to produce underlying data, I stated:

> "The inadequacy of the spreadsheets showing only monthly averages as a method for calculating damages is underscored by the error in the *Hunter* case, an error that overstated Orthofix's sales by a factor of two, and which resulted in the imposition of sanctions. I agree with Judge Schanzle-Haskins that this error "may certainly be considered" with respect to the present motion. I also agree that while Judge Zahoury found in the *Hunter* case that Orthofix was not required to create a 'custom report,' there is an alternative: production of the underlying sales data to the Defendant, 'who could make an analysis of the underlying date to challenge the 'average' profit figures compiled by Orthofix.'" *Id*., p. 6.

This case is similar to *Auto Industries Supplier Employee Stock Ownership Plan v. Ford Motor Company*, 435 Fed. App'x 430, 2011 WL 2610584 (6th Cir. 2011), where the Sixth Circuit upheld Judge Cohn's order excluding expert testimony on the basis of

-8-

unreliability. As in the present case, the expert in *Auto Industries* relied on data

compilations and summaries that were prepared by someone else, but did not himself

examine any of the underlying documentation. And like Orthofix, the plaintiff in *Auto*

*Industries* claimed that the summaries "were prepared in the ordinary course of business,"

and that review of voluminous documents "was not necessary or appropriate." *Id.* at 454.

Rejecting these arguments, the Court held that "because [the expert] had no familiarity

with the underlying source documents, he was not qualified to testify as an expert under

Rule 702, because his expert opinion was not based on 'sufficient facts and data.'"

Quoting and incorporating Judge Cohn's findings, the Court stated:

> "Ford argues that SNAPP cannot meet the threshold requirement of
> *Daubert* and Rule 702 with respect to Frazee's opinions and testimony
> essentially because Frazee's testimony made clear that he had little, if any
> personal knowledge of the underlying data used to created [sic] the opinions
> contained in his report. The Court agrees. *As was born out at the hearing,*
> *Frazee accepted summaries of data supplied to him by Vetter wholesale and*
> *simply used the data, often in the same format sometimes reformatting the*
> *data, to prepare his report. Frazee had no personal involvement in the*
> *preparation of the data*."  *Id.* (Emphasis added).

In support of its argument that any deficiencies in O'Brien's report go to weight

rather than admissibility, Orthofix points out that in the Ohio case against Turner, Judge

Zahoury admitted O'Brien's report. However, the Ohio case was tried before the judge,

not a jury. "The 'gatekeeper' doctrine was designed to protect juries and is largely

irrelevant in the context of a bench trial." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d

840, 852 (6th Cir. 2004).  *See also  UAW v. General Motors Corp.*,  235 F.R.D. 383, 387

(E.D.Mich. 2006)("The trial judge sitting alone is presumed capable of weighing evidence to sift the important from the unimportant, and even the admissible from the inadmissible when those are intertwined in a way that might counsel excluding the same evidence from consideration by a lay jury").

O'Brien's initial damages calculation was overstated by a factor of two, and without examining the underlying documents, he was incapable of discovering that error. He has still not looked at even a sampling of those documents, and the Court can have no confidence that his current calculation is based on "sufficient facts and data." Because O'Brien's report and testimony fails the reliability test of Rule 702 and *Daubert*, they must be excluded.

## IV.   CONCLUSION

Defendant Robert Lemanski's Motions to Exclude Opinion Testimony of Plaintiff's Damages Expert [Doc. #74 and #75] are GRANTED.

IT IS SO ORDERED.


s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: September 29, 2015

-10-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on September 29, 2015, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla

Case Manager to the
Honorable R. Steven Whalen